(No. 34858.—

Anthony Fillichio *et al.*, d/b/a Austin Liquor Marts, Appellees, *vs.* The Department of Revenue, Appellant.

*Opinion filed November 26, 1958—Rehearing denied Jan. 22, 1959.*

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, of counsel,) for appellant.

LOUIS WILSON, of Chicago, for appellees.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

Appellant, the Department of Revenue of the State of Illinois, appeals from a judgment of the circuit court of Cook County which, in an administrative review proceeding, reversed a decision of the Department that appellees, Anthony and Bennie Fillichio, doing business as Austin Liquor Marts, were subject to a deficiency assessment and penalty under the Retailers' Occupation Tax Act. (Ill. Rev. Stat. 1951, chap. 120, par. 440, *et seq.*) The revenue being involved, we have jurisdiction on direct appeal.

During the period from January 1, 1952, to July 31, 1953, appellees were engaged as partners in the occupation of selling liquor at retail in the city of Chicago. Both package liquor and drinks for consumption on the premises were sold, with all sales being made from four store locations established by the partners between January and August, 1952. The partnership filed tax returns with the Department as required by the Retailers' Occupation Tax Act and, for the 19-month period in question, reported gross sales of $265,278.98, upon which tax was paid. Pursuant to authority conferred by section 4 of the act (par. 443), the Department conducted an investigation, concluded that

the gross receipts had been understated, corrected the returns filed and, on November 9, 1953, gave appellees notice of a proposed deficiency assessment of $12,295.06, plus a penalty of $1,295.51, or a total of $14,250.57. Appellees protested the proposed assessment and requested a hearing, which was granted.

After several continuances the hearing commenced on May 13, 1954. Neither appellee was present but their counsel appeared. To establish its proposed assessment the Department introduced the testimony of Walter V. Lesniak, a special auditor who was assigned to audit appellees' books and records shortly after July 31, 1953. In detailing how the books were never made available to him, Lesniak testified that his first contact was with Bennie Fillichio who stated that his brother, Anthony Fillichio, was in charge of the records, that the latter was busy at another store, and that the witness should come back some other time. Lesniak later met with Anthony by appointment and was told that more time would be needed because the records were not ready and were in the hands of one Staats, an auditor employed by the partnership. The latter, who was contacted only after repeated efforts, confirmed that he had the records and advised Lesniak he would telephone when they were ready. When Staats failed to call, or to respond to further calls, Lesniak took the matter up with his superior who directed him to proceed and to base an assessment on the best information he could get. Thereafter, Lesniak visited each of the four liquor stores and estimated the cost value of their combined liquor inventories as being $39,000. Further estimating, on the basis of experience, that such inventory would be sold at a mark up of 25 per cent over cost, a sum totalling $9,750, Lesniak calculated that the total monthly receipts of the four stores would be $48,750. By comparing his calculation of monthly receipts with those actually reported by the appellees, he concluded there was additional tax liability and a penalty

as previously set forth. With Lesniak's testimony as a foundation, his written report and documentary proof of the administrative actions, taken by the Department to correct appellees' returns and to effect the deficiency assessment, were also admitted in evidence.

Appellees' counsel did not cross-examine Lesniak or submit proof on this occasion but requested a continuance to June 11, 1954, indicating that his defense was not fully prepared. On the latter date Lesniak was not available for cross-examination and the hearing was continued by stipulation to July 8, 1954. It was, however, again continued to August 6, 1954, because appellees' counsel was hospitalized. When the hearing was resumed on the August date the Department introduced in evidence a *subpoena duces tecum,* issued June 15, 1954, commanding appellees to produce all books and records pertinent to the hearing. Appellees did not comply or appear but, instead, their counsel asked for a further continuance stating that he was unprepared and that Anthony Fillichio, the only one familiar with the business operations, was in a hospital. The hearing officer, however, denied the request, concluded the hearing, and subsequently entered a finding and recommendation that the Department issue a final assessment against appellees for the deficiency and penalty proposed. Such a final assessment was issued September 10, 1954, whereupon appellees filed a complaint for judicial review which, on March 14, 1957, resulted in an order remanding the cause to the Department for the purpose of affording appellees an opportunity to submit their books and records.

When the hearing before the Department was resumed, appellees, then represented by new counsel, introduced in evidence ledger sheets which purported to show the daily receipts from all stores owned and operated by the partnership for the period in question. The sheets reflected a gross income of $1,118,814.67 for that time, but receipts taxable under the occupation tax act of only $265,278.98, the

amount reported in the returns filed with the Department. From such figures it is to be seen that nontaxable receipts amounted to approximately 76 per cent of the gross receipts, while the taxable receipts approximated 24 per cent. In explaining the operation of the business Anthony Fillichio testified that each of the four stores was an entirely new enterprise, that one was closed after operating at a loss for seven months, and that, to stimulate and build up business, liquor was sold at cut rates and in some instances at no profit whatever. This policy, he stated, brought more customers into the stores and increased the income from nontaxable sources.

Separate columns on the ledger sheets indicated that the sources of nontaxable receipts were "Games, Amusements, Rentals" and "Cashing Checks" and, according to Anthony Fillichio, receipts from all sources were rung up on cash registers, though on separate keys, from which he took daily readings and made entries in the ledger. He stated that receipts under "Games" were received from dice games known as "Twenty-six" and "Hooligan" and that the daily entries for each store represented the net realized after winners had been paid off in cash. When a winner was paid, money was taken from the cash register, a record was made and, at the end of the day, the total winnings were deducted from the register reading of receipts realized from such source. On cross-examination Anthony stated that supporting evidence, in the form of slips showing the number of winners and dice games played, had been stored in a basement and had been destroyed by a flood occurring a year prior to the time he testified. According to his further testimony receipts listed under "Amusements" came from juke boxes, pinball machines, pools on various sporting events, and from the operation of concessions in what he described as a "kiddyland," all of which were rung up on the cash registers and recorded daily. As to the last item, he stated that he had loaned $10,000 to a friend who

operated the amusement concessions and, as a result of the deal, was paid 20 per cent of the gross receipts realized from the concessions. While he stated that payments on the loan were not included in ledger sheets of the liquor stores, it appears that the payments of the 20 per cent interest in the gross receipts from the concessions were rung up and recorded daily as part of the partnership's receipts from "Amusements," as were sums taken in at the liquor stores for the sale of tickets to the "kiddyland." Here again it was testified that supporting evidence for the daily entries under this source had been destroyed by flood.

Further testifying with relation to the sources of non-taxable receipts, Anthony stated that the liquor stores rented equipment and glassware, taking a hand receipt therefor, and that when the equipment was returned the rental paid was rung up on a separate key of the cash registers and the receipts destroyed. Register readings from this source were then entered in the daily ledger as "Rentals." In explanation of the ledger entries for "Cashing Checks," Anthony testified that a charge of 15 cents was made for cashing customer checks over $10, and a charge of 7 cents to 8 cents for checks under such amount, and that money thus collected was separately recorded and tabulated by the use of still another identifying key on the cash registers.

Herbert Gross, a Department auditor of long experience, testified in rebuttal after examining the ledger sheets admitted in evidence and related that, as a result of his examination, he had recommended that no change be made in the proposed deficiency assessment against appellees because no customary supporting data, such as register tapes or working papers, had been presented to substantiate the nontaxable receipts claimed. The witness likewise stated his opinion that the ledger sheets were not original books of entry, saying that the obvious use of but one pencil to make all entries for the 19-month period, and the consistency of its point at all times, caused it to appear "that

the figures entered on these sheets were done all at one sitting, rather than daily." From all the circumstances, he concluded that the ledger sheets had been made for the sole purpose of overcoming the Department's *prima facie* case.

When the supplemental evidence was concluded, the hearing officer again made findings and recommendations that the proposed deficiency and penalty be assessed and caused the record of the supplemental hearing to be filed in the circuit court. On review of the entire record, however, the court found that the Department had failed to prove its case against appellees, and held the deficiency assessment and penalty to be of no force and effect. This appeal by the Department has followed.

Under the provisions of the Retailers' Occupation Tax Act a proposed assessment of the tax, being a correction of the returns filed by the taxpayer, is deemed to be *prima facie* correct and *prima facie* evidence of the correctness of the amount of tax shown to be due therein. (Ill. Rev. Stat. 1951, chap. 120, par. 443; *Lutkus v. Department of Finance*, 385 Ill. 221; *Novicki v. Department of Finance*, 373 Ill. 342.) The taxpayer, thus, has the burden of proving by competent evidence that the proposed assessment is not correct, and when such evidence is not so inconsistent or improbable in itself as to be unworthy of belief, the burden then shifts to the Department which is required to prove its case by competent evidence. (*Goldfarb v. Department of Revenue*, 411 Ill. 573; *Feldstein v. Department of Finance*, 377 Ill. 396; *Anderson v. Department of Finance*, 370 Ill. 225.) Adverting to these principles, appellees contend, as was found by the court below, that their evidence overcame the Department's *prima facie* case and that the Department thereafter failed in its burden of proving its case by competent evidence. The Department, while making some contention that the daily ledger sheets were not competent evidence in the absence of supporting data, argues

chiefly that appellees' evidence is wholly unworthy of belief and thus insufficient to overcome the *prima facie* case.

Upon examination of the entire record, it is our opinion that the Department is correct in its assertion that the evidence introduced by appellees is so improbable in itself as to be unworthy of belief. The principal basis for this conclusion is found in the entries on the daily ledger sheets denoting nontaxable receipts allegedly received from the 7-cent to 15-cent fees collected for cashing checks over the 19-month period in question. For all months from February, 1952, through December, 1952, the daily entries of receipts from this source total exactly $400 in each month; for January, 1953, and for each month thereafter through July, 1953, the daily receipts from the same source totalled exactly $700 a month. While the sameness and roundness of the totals for each month are in themselves incredulous, there are yet other implausibilities surrounding these entries which inspire a conclusion that the ledger sheets are not worthy of belief. For example, the sheets reveal that the partnership operated but two stores during March, 1952, from which it realized $31,626.09 in gross receipts. The following month, April, 1952, three stores were operated and produced gross receipts of $48,853.94, yet, despite the addition of another store and the increase in gross receipts, the alleged income from cashing checks was the same for both months, *viz.* $400. During December, 1952, four stores were being operated and, according to the ledger sheets, had gross receipts of $115,511.83, yet the income from cashing checks remained constant at $400. In January, 1953, the same four stores purportedly had a decrease in gross receipts to $62,849.48, but in that month the income from cashing checks increased to $700 and stayed at such figure for every month through July, 1953, even though the operation of one store was abandoned in June, 1953, and even though the gross receipts showed a substantial variance in each month. The operation of a

different number of stores from time to time, as well as the monthly fluctuations in gross receipts, lead only to the logical conclusion that the number of customers served also varied in proportion. Thus if the fees for cashing checks remained constant over the 19-months period, and Anthony testified that they did, it is beyond belief and human experience that the total monthly income realized from cashing checks would come out at the same round figures in each month, and that it would not vary in proportion to the gross receipts and customers served. We conclude that these inconsistencies, apparent on the face of the ledger sheets, render the appellees' evidence so improbable as to be unworthy of belief and, therefore, insufficient to overcome the *prima facie* case made by the proposed assessment of the Department.

While the inconsistencies already noted are sufficient to discredit appellees' records and testimony in their entirety, we are constrained to remark upon another circumstance that casts doubt upon the records produced. According to Anthony Fillichio the ledger sheets were a daily record and, presumably, should have been complete when the Department initiated its investigation shortly after July 31, 1953. Appellees, however, made repeated representations that their records were not ready and, after failing to heed a *subpoena duces tecum* issued on June 15, 1954, did not produce the alleged daily ledger sheets until the supplemental hearing on June 7, 1957, after the administrative hearing on the proposed assessment had reached an adverse result. These evasions and procrastinations, which raise a question of good faith, are strong support for a conclusion that the daily record did not in fact exist at the time the proposed assessment was made. Similar recalcitrance in producing records was not present in *Goldfarb* v. *Department of Revenue*, 411 Ill. 573, which appellees cite to us as authority for their contention that the daily ledger sheets were sufficient to overcome the *prima facie* case, and even that case

recognizes the rule that the taxpayer's evidence must be credible evidence. See also: *Du Page Liquor Store, Inc. v. McKibbin,* 383 Ill. 276; *Lutkus* v. *Department of Finance,* 385 Ill. 221.

Appellees complain in this court that the artificial method of arriving at the deficiency assessment resulted in a tax on their personal property rather than a tax upon the privilege of selling tangible personal property at retail. Such a contention ignores, however, that the proposed assessment is based upon the estimated receipts realized from the sale of the inventory at retail, rather than upon the inventory itself. Moreover, section 4 of the Retailers' Occupation Tax Act, (Ill. Rev. Stat. 1951, chap. 120, par. 443,) permits the Department to correct the tax return "according to its best judgment and information." Here, appellees made no records available to the Department, and defaulted in their promises to do so, thus closing the door on precise calculation. Under such circumstances, the method employed was neither arbitrary nor unreasonable. (Cf. *Goldfarb* v. *Department of Revenue,* 411 Ill. 573; *Anderson* v. *Department of Finance,* 370 Ill. 225.) In view of appellees' evasive tactics and inasmuch as they have never produced inventories, purchase records, sales records, or other credible proof to overcome the proposed assessment and penalty, the tax as finally assessed must be presumed to have been legally levied. *Du Page Liquor Store, Inc.* v. *McKibbin,* 383 Ill. 276; *Lutkus* v. *Department of Finance,* 385 Ill. 221; *Tatz* v. *Department of Finance,* 391 Ill. 131; *Anderson* v. *Department of Finance,* 370 Ill. 225.

For the reasons stated, the judgment of the circuit court of Cook County, voiding and cancelling the proposed assessment and penalty, is reversed.

*Judgment reversed.*