MEL-PARK DRUGS, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—89—1938

Opinion filed July 30, 1991.

Gerald W. Shea and Ira A. Rogal, both of Shea, Rogal & Associates, of Westchester, for appellant.

Roland W. Burris, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Gerald S. Post, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE COCCIA delivered the opinion of the court:

Plaintiff, Mel-Park Drugs, Inc. (Mel-Park), appeals from a judgment entered by the circuit court of Cook County on administrative review affirming the decision of an administrative law judge (ALJ) upholding an assessment by the Department of Revenue (Department), against plaintiff in the amount of $179,069.36. The Department assessed plaintiff for tax deficiencies, penalties, and interest under the service occupation tax (SOT), retailer's occupation tax (ROT), municipal retailer's occupation tax (MROT), and parallel retailer's and ser-

vice occupation taxes under the Regional Transportation Authority tax act (RTA).

Mel-Park Drugs is a pharmacy located in Melrose Park, Illinois. It sells prescription and nonprescription medicines and drugs, food, liquor, cigarettes, newspapers, and miscellaneous nonfood and nondrug items, and also provides film processing services. Lee Alport is a pharmacist who works at Mel-Park and is one of its owners. Alport prepared and filed Mel-Park's monthly State tax returns. In September 1983, the Department began a field audit of Mel-Park's sales and service tax returns.

The auditor, Eileen McGinnis, found that for the 35-month period from July 1, 1981, through May 31, 1984, Mel-Park had underpaid its retailer's occupation tax (ROT) obligation by $63,227.23 (Ill. Rev. Stat. 1989, ch. 120, par. 440 *et seq.*) and underpaid its service occupation tax (SOT) obligation by $5,998.30 (Ill. Rev. Stat. 1989, ch. 120, par. 439.101 *et seq.*). McGinnis also found that Mel-Park had underpaid its municipal retailer's occupation tax (MROT) (Ill. Rev. Stat. 1989, ch. 24, par. 8—11—1) and municipal service occupation tax (MSOT) (Ill. Rev. Stat. 1989, ch. 24, par. 8—11—5) obligations by $19,523.31, and underpaid its Regional Transportation Authority retailer's occupation tax (RTA ROT) (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 704.03(e)) and service occupation tax (RTA SOT) (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 704.03) obligations by $19,522.60. At the conclusion of the audit McGinnis prepared corrected tax returns.

On April 1, 1985, the Department issued notice of the above-described tax liabilities to Mel-Park. The total balance due was $108,271.44 plus penalties and interest, for a grand total of $171,372.07 through April 30, 1985, with interest accumulating. On April 15, 1985, Mel-Park requested a hearing, which was held July 31, 1986. Thereafter, plaintiff filed its brief on September 2, 1986, and the Department entered a "Hearing Disposition" on or about August 14, 1987, and a "Final Assessment" on or before October 15, 1987.

Section 4 of the Retailer's Occupation Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 443) provides, with regard to the examination and correction of tax returns, that:

> "As soon as practicable after any return is filed, the Department shall examine such return and shall, if necessary, correct such return according to its best judgment and information, which return so corrected by the Department shall be prima facie correct and shall be prima facie evidence of the correctness of the amount of tax due, as shown therein. * * *

\*\*\*

Proof of such correction by the Department may be made at any hearing before the Department or in any legal proceeding by a reproduced copy or computer print-out of the Department's record relating thereto in the name of the Department under the certificate of the Director of Revenue. If reproduced copies of the Department's records are offered as proof of such correction, the Director must certify that those copies are true and exact copies of records on file with the Department. If computer print-outs of the Department's records are offered as proof of such correction, the Director must certify that those computer print-outs are true and exact representations of records properly entered into standard electronic computing equipment, in the regular course of the Department's business, at or reasonably near the time of the occurrence of the facts recorded, from trustworthy and reliable information. Such certified reproduced copy or certified computer print-out shall without further proof, be admitted into evidence before the Department or in any legal proceeding shall be prima facie proof of the correctness of the amount of tax due, as shown therein."

The above-quoted section is incorporated by section 12 of the Service Occupation Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 439.112). Similarly, the pertinent provisions of the ROT Act are incorporated by reference in the MROT and the RTA Acts. *Elkay Manufacturing Co. v. Sweet* (1990), 202 Ill. App. 3d 466, 470, 559 N.E.2d 1058, 1060.

■ The Department's submission of corrected returns establishes its *prima facie* case. (*Young v. Hulman* (1968), 39 Ill. 2d 219, 234 N.E.2d 797; *Central Furniture Mart, Inc. v. Johnson* (1987), 157 Ill. App. 3d 907, 910, 510 N.E.2d 937, 939.) As summarized in *Masini v. Department of Revenue* (1978), 60 Ill. App. 3d 11, 14, 376 N.E.2d 324, 327, the statute has been strictly construed insofar as establishing a *prima facie* case is concerned; Illinois courts have uniformly sustained a *prima facie* case based on corrected tax returns.

In *Masini v. Department of Revenue*, this court stated that while there is no statutory requirement that the Department substantiate the basis for the corrected return or produce the auditor who computed it in order to support its *prima facie* case, when the corrected return is called into question, the method employed by the Department in correcting the taxpayer's return must meet some minimum standard of reasonableness, citing *Fillichio v. Department of Revenue* (1958), 15 Ill. 2d 327, 155 N.E.2d 3, and *Elkay Manufacturing Co. v.*

*Sweet,* 202 Ill. App. 3d at 470, 559 N.E.2d at 1060. The reasonableness standard is based upon the statutory provision which requires the Department to correct returns "according to its best judgment and information." *Masini v. Department of Revenue,* 60 Ill. App. 3d at 14, 376 N.E.2d at 327.

In the case at bar, Mel-Park seeks to overturn the final assessment on the basis that the audit was conducted by unreasonable methods and its returns were not corrected according to the Department's "best judgment and information." Therefore, Mel-Park argues, the Department has failed to establish a *prima facie* case that the amount of tax due is correct. Alternatively, Mel-Park argues that it has overcome any *prima facie* case the Department has established and the Department has not proved its final assessment to be correct.

In order to address these claims, we must review the evidence presented at the administrative hearing in the case at bar.

At the hearing the auditor, Eileen McGinnis, testified. Also, her audit summary and the audit papers were introduced into evidence. McGinnis found that Mel-Park's records were incomplete such that, of the 35-month audit period, she was able to test check only three months, November 1981, March 1983, and February 1984. Most notably lacking from the records submitted were daily cash register tapes showing gross sales receipts, and daily register tapes showing prescription costs. In addition, McGinnis noted a discrepancy between Mel-Park's Federal income tax return and its monthly State tax return, which was the result of an unorthodox practice of "netting out" prescription service fees, cigarettes, and newspapers from the total amount reported on line one of the State return for gross retail sales receipts. Further, McGinnis testified that Mel-Park essentially took a double deduction for purposes of calculating its SOT liability, by reporting only 50% of its prescription costs as the taxable base for the SOT and then taking 50% of that figure as its liability. Mel-Park had, in effect, merged the Illinois Administrative Code's actual cost method (Method No. 2) and the estimated 50% of gross receipts method (Method No. 3) when calculating its SOT liability. Thus, McGinnis had to reconstruct the gross sales receipts and prescription and nonprescription sales receipts from the incomplete documents provided to her.

McGinnis attempted to reconstruct the correct gross sales receipt figure by using check registers and matching purchase invoices for the three test months. She attempted to check purchases to verify the percentage of food, prescription drugs and nonprescription drugs purchased. She categorized the purchases for the test months and con-

cluded that food and drug purchases were 36.5% of the total purchases for those months and, therefore, 63.5% of the total purchases were for nonfood and nondrug items. She then derived the average drug purchases from the food and drug purchases, concluding that 59% of the food and drug purchases were for drugs. Thus, she estimated that about 22% (21.5%) of Mel-Park's total sales receipts were from the sale of drugs. Using this basis, she estimated Mel-Park's gross retail sales, calculated its liability and corrected its returns. As previously stated, McGinnis concluded that the underpaid liability was in the amount of $108,271.44.

McGinnis' cross-examination hearing testimony acknowledged that she had lumped together food and nonprescription drugs in the same category with prescription drugs. In a second category she placed all other nonfood items, such as liquor, newspapers, magazines, cigarettes, and other miscellaneous items. McGinnis acknowledged that food and nonprescription drugs, while taxed at a lower rate than nonfood items, are taxed differently than prescription drugs. However, McGinnis testified that she could not determine from the purchase invoices for medicines and drugs which were prescription and which were nonprescription. Thus, McGinnis admitted that, in calculating Mel-Park's tax deficiency regarding drugs, she used a figure for the sale of drugs which included sales of both nonprescription and prescription drugs.

McGinnis testified that she did not use a "markup" method to calculate Mel-Park's tax liability. However, McGinnis testified that she was not informed of the sale price markup percentages that Mel-Park used.

Joseph Bigane III, a CPA, testified as an expert witness for Mel-Park, having been retained to review the audit procedures and tax deficiency assessment. He also reviewed the general ledger, monthly receipts and cash disbursements during the audit period, and purchase invoices for the test months used by the auditor. Bigane said that to the extent nonprescription drug sales were categorized with prescription drugs sales, the Department's assessment of tax liability was inaccurate because the "bottom line" for the SOT was too high.

Bigane had Alport mark on a January 1984 invoice from the General Drug Co., a Mel-Park supplier (taxpayer's group exhibit No. 5), which drugs were nonprescription and which were prescription. He testified that the bottom of the invoices indicated partial verification of Alport's notations, because there were (a) prescription symbols, (b) narcotics symbols and (c) price indicators made or omitted, any of which would indicate whether the purchase was a prescription or non-

prescription drug. Bigane then categorized the purchases into three categories: prescription drugs, nonprescription drugs, and nondrugs. However, Bigane could not apply this method to the first test month, November 1981, and thus based his analysis on the other two test months, March 1983 and February 1984. Bigane testified that his method produced a figure (apparently gross sales figure) for the three test months that was $100,000 different than the auditor's figure. In Bigane's opinion, the figure Mel-Park used for prescription drug costs on its State sales tax return was reasonable because his own calculation was within $50,000 of the reported figure.

Relative to the ROT liability, Bigane testified that the auditor had unreasonably ignored profit margins (markups) when calculating gross sales receipts based on purchases. He said that Mel-Park's gross profit margin, the difference between the selling prices and the cost of the goods, should be expressed as a percentage. Based on information provided to him by Lee Alport, Bigane testified that Mel-Park had a profit margin of 80% on prescription drugs and 33% on over-the-counter drugs, 30 to 33⅓% on food items, and 20% on newspapers. Bigane obtained outside verification of the reasonableness of Alport's percentage figures, primarily relying upon the National Association of Retail Druggists.

Bigane used the Department's figures for food purchases for the test months. Using Alport's gross profit margins, Bigane calculated a larger amount of food sales for the audit period than did the auditor. Bigane testified that the auditor's estimates had been based on an assumption that all gross profit margins for all items were identical but that this assumption was unreasonable, because the markup on some items was greater than on others.

Bigane testified that the auditor had made mathematical errors in ignoring a volume discount for one month and a $5,000 prepayment.

Bigane also testified that according to the Lilly Digest, an authoritative source for the pharmaceutical industry, a pharmacy with sales in the range of Mel-Park's sales should have prescription drug sales at about 68.5% of total sales. The auditor had estimated Mel-Park's drug sales at a much smaller percentage. The auditor had estimated that food and drugs were about 36.5% of total sales and that drug sales were 59% of the food and drug sales, or about 21% or 22% of the total sales, not 68.5%.

Thus, according to Bigane's testimony, the method used by the auditor to calculate tax liability was unreasonable and the resulting assessment of tax liability was not accurate.

Lee Alport testified that he kept the books for Mel-Park, that an auditor assisted him monthly and a CPA did an annual audit. Alport prepared the monthly returns and thought they were accurate when he prepared them. He acknowledged that he excluded pharmacy fees and periodical sales from the first line of the State return for gross receipts. Alport said that Mel-Park filled about 165 to 175 prescriptions per day. There are two cash registers in the pharmacy area, front and back. The pharmacy area is itself located at the back of the store. The prescription sales are entered on the front cash register and the cost of prescriptions is recorded by the pharmacist on a "tally sheet." When pharmacists at Mel-Park prepared a prescription, they would remove the item from a general container on which was marked the unit cost. That cost would be recorded on a tally sheet. Each day Alport totalled the cost of prescriptions from the tally sheets. He also totalled the prescription sales on the front register. Each month he totalled the costs of prescriptions on the rear register and also obtained a grand total of prescription sales and records on the register. Although he said he had shown his monthly total tapes from the cash register and the tally sheets to the auditor, he threw away the tapes from the front register once he had recorded the figures elsewhere, and he threw away the tally sheets of the costs. Thus, there were no daily tapes of prescription sales available, nor daily records of costs. Alport produced a tape showing monthly total prescription sales, costs, and fees for the audit period. For example, one tape, for June 1981, exhibit 3, reflected the figure $65,119.72 as gross total pharmacy sales for that month, and a figure of $10,325.53 for total prescription costs and the difference, $54,794.19, was the total for prescription fees.

On October 15, 1987, ALJ Ralph Jacobson issued a two-page determination and recommended decision. That recommended decision reduced Mel-Park's tax deficiency from $108,271.44 to $69,484, plus interest and penalties. ALJ Jacobson's recommended decision was based, in part, on additional documentation provided by the Department in April and May 1987, and a redetermination of the deficiency, characterized as a "reaudit." However, no one made these papers a part of the record or moved to reopen the proceedings.

On November 16, 1987, Mel-Park filed its complaint for administrative review. On May 27, 1988, the circuit court, by Judge Earl Arkiss, remanded the matter to the ALJ for completion of the record and written findings of fact, noting that the record did not contain a request for a reaudit and the reduction in the tax deficiency was not explained by the record as it stood.

On remand, because ALJ Jacobson had left the Department, ALJ Valerie Bawolek assumed the file, reviewed the record, and entered a 15-page recommended decision on October 4, 1988. In that recommended decision ALJ Bawolek declined to consider the April and May 1987 work papers in the file relating to the redetermination and reaudit identified in ALJ Jacobson's decision. Bawolek indicated that her fact findings were based exclusively on the matters in evidence and officially noticed. She further deemed the revision of the amount of tax deficiency by ALJ Jacobson as unsupported by the evidence and she set aside that recommendation.

ALJ Bawolek found that the audit procedures were reasonable despite the auditor's failure to use a markup method of estimating gross retail sales receipts. She found that Mel-Park did not rebut the Department's *prima facie* case. To avoid an unduly harsh result, she allowed an ROT deduction for prescription service fees by using a method for calculating the deduction which had not been employed by Mel-Park but which was supported by the record. The Department adopted the ALJ's recommendation, leading to its final tax assessment of $179,069.36 on October 18, 1988.

Mel-Park then appealed to the circuit court. Mel-Park contended below, as it does on appeal, that the audit was so defective that no assessment could be based on it and that no *prima facie* case has been established by the Department. Alternatively, Mel-Park contended that its evidence at the administrative hearing overcame the Department's *prima facie* case and that the Department has not carried its burden by sufficient evidence to support its assessment. In addition, Mel-Park contended that the remand order was violated by the ALJ's substitution of a new decision and withdrawal of the prior ALJ's decision.

On July 12, 1989, Judge Randye Kogan held that ALJ Bawolek had essentially complied with the prior remand order because that order had directed that written findings should be made. Judge Kogan rejected Mel-Park's claim that the Department lacked the authority to submit a new decision and tax assessment on remand. Also, Judge Kogan affirmed the findings of fact and conclusions of law by ALJ Bawolek that the Department's audit was not defective and that it had proved a *prima facie* case of tax deficiencies based on properly corrected tax returns. Judge Kogan held that the findings and conclusions were not against the manifest weight of the evidence or contrary to law.

## I

The first issue on review has two components. They are: (a) whether the Department's audit was so defective that no assessment could be based upon it such that the Department failed to establish a *prima facie* case against Mel-Park as to the amount of liability; and, in the alternative, (b) whether Mel-Park presented sufficient evidence to shift the burden to the Department to sustain its tax assessment.

We begin by noting that the findings and conclusions of an administrative agency are *prima facie* correct and will not be disturbed unless they are against the manifest weight of the evidence. (*Central Furniture Mart, Inc. v. Johnson*, 157 Ill. App. 3d at 910, 510 N.E.2d at 939.) Our task is to review the circuit court's affirmance of the administrative judge's decision. We are not to substitute our judgment for that of the administrative law judge but to determine only whether it is against the manifest weight of the evidence or contravenes the law. *Gas Research Institute v. Department of Revenue* (1987), 154 Ill. App. 3d 430, 433-34, 507 N.E.2d 141, 143.

Section 3—110 of the Illinois Code of Civil Procedure concerning administrative review (Ill. Rev. Stat. 1989, ch. 110, par. 3—110) provides that administrative findings of fact are to be considered *prima facie* true and correct by the circuit court:

> "Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." (Emphasis added.) Pub. Act 82—280 §3—110, eff. July 1, 1982.

## A

■■ The Retailer's Occupation Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 440 *et seq.*) is a tax on the occupation of selling tangible physical property at retail. The tax exacted is not a sales tax on the consumer but a tax on the retail seller as measured by his sales to consumers. (*People's Drug Shop, Inc. v. Moysey* (1943), 384 Ill. 283, 285-86, 51 N.E.2d 144, 146.) It is a tax on the occupation and not on the sale, although sales are used as a measure of the tax assessed. (384 Ill. at 286, 51 N.E.2d at 146.) When calculating ROT liability the

auditor must determine the taxpayer's gross retail sales receipts. This is ordinarily done through the records of the taxpayer, who is required to maintain records in sufficient detail to accurately define his tax liability. (Ill. Rev. Stat. 1989, ch. 120, par. 446.) In *Copilevitz v. Department of Revenue* (1968), 41 Ill. 2d 154, 157, 242 N.E.2d 205, 207, our supreme court reiterated the basic rule that the statutory recordkeeping provisions of the ROT are mandatory.

The Service Occupation Tax (SOT) Act (Ill. Rev. Stat. 1989, ch. 120, par. 439.101 *et seq.*) is a tax on persons making sales of service. The SOT is intended to place service providers on a tax parity with retailers to the extent they transfer tangible personal property to the ultimate consumer as an incident to the sale of service. (*A.R. Barnes & Co. v. Department of Revenue* (1988), 173 Ill. App. 3d 826, 829, 527 N.E.2d 1048, 1050.) The SOT is a tax on the cost to service providers (servicemen) of tangible personal property transferred as an incident to such sale. (*Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52, 55, 319 N.E.2d 5, 6.) Thus, in calculating the SOT liability, the auditor must ascertain the wholesale cost of items of property. For prescription medicines and drugs, for example, there is a service occupation tax on the containers, labels, and the wholesale cost-price of the product. Under the Illinois Administrative Code, the portion of the retail sales price attributable to the pharmacist's services is not taxed. (86 Ill. Adm. Code §140.135 (1985).) The pharmacist pays the SOT on the property transferred incidentally to selling the medicine or drug and declares the "prescription service fee" as a deduction from the ROT. For prescription medicines and drugs there is no ROT. (86 Ill. Adm. Code §§130.2035(a), (b)(1) (1985).) Conversely, for nonprescription medicines and "over-the-counter" drugs only the ROT is applicable.

A pharmacist is required to keep records detailing his prescription costs and sales. (86 Ill. Adm. Code §§130.310(d), 130.801, 130.805(a), 130.810 (1985).) There are four methods provided by the Illinois Administrative Code for calculating the prescription service fee deduction, including an "actual cost" method (Method No. 2) and an estimated method based on attributing costs as 50% of the gross prescription receipts (Method No. 3). 86 Ill. Adm. Code §140.135 (1985).

Items sold by a pharmacy which are neither food nor prescription or nonprescription medicines or drugs are taxed under the ROT Act at a higher rate than food (other than food prepared for immediate consumption) and prescription and nonprescription medicines and drugs. 86 Ill. Adm. Code §130.310(a) (1985).

The first component of Mel-Park's argument is that the audit was fatally defective because the auditor failed to distinguish between prescription and nonprescription medicines and drugs when estimating gross receipts, thus lumping both together with food items. Mel-Park claims that this procedure resulted in an inflation of the basis for SOT liability because there is no SOT liability except for prescription medicines and drugs. Also, Mel-Park claims that the auditor failed to consider the different markup percentages used to set retail prices for different items, and instead used a one-to-one ratio of purchases to sales for all items. For example, the auditor estimated that if an item represented 10% of the wholesale cost Mel-Park expended to purchase it, then the auditor assumed that that item accounted for 10% of the gross retail sales receipts. Mel-Park complains that this is an unreasonable assumption. As a result, the auditor underestimated the percentage of gross receipts attributable to high markup items with low tax rates, such as prescription medicines and drugs. For example, sales of items with an 80% markup for retail might account for a large portion of the pharmacy's total gross retail sales receipts even though the same item would account for a low percentage of total costs. Thus, by using the one-to-one purchase percentage to sales percentage, the auditor inflated Mel-Park's tax liability.

In *Young v. Hulman* (1968), 39 Ill. 2d 219, 221, 234 N.E.2d 797, 799, a similar claim of a defective audit was raised. There the Department's auditor testified that he could not reconcile the amount of sales reported by the taxpayer in its monthly return with its books and records. He then attempted to reconstruct the sales records by going outside the taxpayer's books and records and reviewing actual transaction documents and purchase invoices and inventory records. The taxpayer complained that the method used was intrinsically defective because it ignored the account books and reviewed the documents from which the books were made. Our supreme court held that there was ample justification for the audit method where the auditor stated that he went outside the taxpayer's books and records because they failed to support the taxpayer's monthly returns and in some instances the taxpayer's methods of accounting did not comply with the Department rules and regulations. The supreme court refused to disregard the audit entirely.

■ We conclude that, under *Young v. Hulman*, it was proper for McGinnis to lump all medicines and drugs together into one category because she had only purchase invoices, checks and bank records, and a general ledger with yearly totals available to her. She testified that she was unable to distinguish prescription from nonprescription drugs

from the purchase invoices provided. The ALJ accepted this testimony, and noted that even Bigane needed Lee Alport's assistance in marking the invoices in order to testify which purchases were for prescription and which were for nonprescription drugs. In addition, Mel-Park's method of netting out deductions was sufficiently unorthodox to justify the method of lumping together all medicine and drug sales as the best available method for reconstructing gross prescription and nonprescription sales receipts. While we recognize that McGinnis denied Mel-Park any prescription service fee deduction based on the failure to provide records of its actual costs of prescriptions, the ALJ ultimately allowed Mel-Park to employ the estimated 50% method and to take the deduction. Therefore, any harm resulting from the lumping together of the prescription and nonprescription medicines and drugs did not affect the prescription service fee deduction. Thus, Mel-Park's SOT liability was not inflated. To that extent, we hold that the audit was not defective in this regard.

■■ However, Mel-Park also maintains that the audit procedures were unreasonable and defective because McGinnis did not use the markup method in estimating total gross sales receipts. Mel-Park insists that the failure to use that method of estimating gross receipts is not consistent with the Department's duty to use its best information and judgment. Ill. Rev. Stat. 1989, ch. 120, par. 443.

Mel-Park's markup theory rests on four Illinois cases where the Department estimated gross retail sale receipts by using purchases and a markup method common in the relevant trade or industry. Mel-Park cites the following cases: *Vitale v. Department of Revenue* (1983), 118 Ill. App. 3d 210, 454 N.E.2d 799; *Fillichio v. Department of Revenue*, 15 Ill. 2d 327, 155 N.E.2d 3; *Puleo v. Department of Revenue* (1983), 117 Ill. App. 3d 260, 453 N.E.2d 48; and *Goldfarb v. Department of Revenue* (1952), 411 Ill. 573, 104 N.E.2d 606. These cases do not require the Department of Revenue to use the markup method when estimating gross retail sale receipts. It is true that when the taxpayer has failed to produce adequate records to substantiate its claimed gross receipts, these cases permit the Department to use the markup practice in the trade and industry in calculating the corrected tax returns. We decline to apply the same rule in reverse and require the Department to use the markup method on the taxpayer's demand. Such a rule would reward the taxpayer's failure to maintain adequate records.

The Department is required only to meet a minimum standard of reasonableness when correcting taxpayer's returns. (*Fillichio v. Department of Revenue*, 15 Ill. 2d 327, 155 N.E.2d 3.) While the Depart-

ment may not ignore the taxpayer's records when they are complete and accurate, and substitute its judgment based upon general estimates (*Goldfarb v. Department of Revenue*, 411 Ill. 573, 104 N.E.2d 606), the records submitted to the auditor in the case at bar were not sufficiently specific to permit the auditor to use a markup method. Indeed, no documentation of markup practices was provided to the auditor. As a matter of policy, the taxpayer should not be able, in effect, to elect a less precise method of supporting its statement of gross receipts when the law clearly mandates that accurate records of actual sales receipts be kept. Ill. Rev. Stat. 1989, ch. 120, par. 446; *Copilevitz v. Department of Revenue*, 41 Ill. 2d at 157, 242 N.E.2d at 207.

We hold that the audit was not fatally flawed despite the auditor's failure to use a markup methodology. To hold otherwise would impose upon the Department one particular method of calculating gross receipts, as a matter of law, even though the taxpayer failed to provide adequate records reflecting actual sales. Therefore, the audit method not being unreasonable, the Department's corrected returns constituted a *prima facie* case supporting its tax assessment. *Young v. Hulman*, 39 Ill. 2d at 222, 234 N.E.2d at 799; *Elkay Manufacturing Co. v. Sweet*, 202 Ill. App. 3d at 471, 559 N.E.2d at 1061.

B

■ Mel-Park's next argument, that its evidence at the administrative hearing overcame the Department's *prima facie* case, covers much of the same ground. To overcome the Department's *prima facie* case, a taxpayer must present more than its testimony denying the accuracy of the assessments, but must present sufficient documentary support for its assertions. (*Elkay Manufacturing Co. v. Sweet*, 202 Ill. App. 3d at 472, 559 N.E.2d at 1061-62.) As a general matter, and leaving aside casual individual sales, all sales of tangible personal property are taxable unless the taxpayer produces evidence identified with its books and records to establish its claim of nonliability. (*Central Furniture Mart, Inc. v. Johnson*, 157 Ill. App. 3d at 910, 510 N.E.2d at 940; *Pedigo v. Department of Revenue* (1982), 105 Ill. App. 3d 759, 434 N.E.2d 860.) The taxpayer has the burden of proving by competent evidence that a proposed assessment is not correct, and when such evidence is not so inconsistent or improbable in itself as to be unworthy of belief, the burden then shifts to the Department, which is required to prove its case by competent evidence. *Young v. Hulman*, 39 Ill. 2d at 223, 234 N.E.2d at 799; *Fillichio v. Department of Revenue*, 15 Ill. 2d at 333, 155 N.E.2d at 7.

In her decision recommending in favor of the Department's assessment of liability, the ALJ placed great reliance on *Du Page Liquor Store v. McKibben* (1943), 383 Ill. 276, 48 N.E.2d 926, to support her conclusion that Mel-Park had failed to overcome the presumption that the returns as corrected by the Department were presumptively correct. In that case the Department introduced the corrected returns of the taxpayer at an administrative hearing. The taxpayer's manager testified that the corrected returns were not correct, and offered written evidence from one month of the relevant six-month period. That evidence consisted of loose written papers from a notebook or diary with figures on them indicating total sales for each day of the month. For two other months there were only monthly totals of the daily sales for those months. The supreme court noted that there was no evidence that the figures obtained were the total daily record of retail sales as the figures introduced were not shown to be identified or connected in any way with books or records kept by the taxpayer.

Mel-Park, by contrast, relies on *Goldfarb v. Department of Revenue* (411 Ill. 573, 104 N.E.2d 606). There, the taxpayer overcame the Department's *prima facie* case because the corrected tax returns had been compiled using the markup method to estimate gross retail sales, even though the taxpayer had a record of his daily receipts taken from the cash register and testified that the record was kept by him or under his supervision. The *Goldfarb* court distinguished *Du Page Liquor Store v. McKibben* because the records there were incomplete and Goldfarb's records were complete as to daily receipts. In *Goldfarb v. Department of Revenue* the court stated that, when the *prima facie* presumption is overcome, the Department has the burden of proving its case by a preponderance of the evidence. The court held that the Department did not question the sufficiency of the taxpayer's records; rather, it ignored them. Thus the supreme court reversed the circuit court, ordering it to quash the assessment.

■ We conclude that the ALJ correctly relied on *Du Page Liquor Store v. McKibben* because there is no evidence of daily sales receipts from the cash register nor daily cost of prescription records. In *Goldfarb v. Department of Revenue*, the taxpayer produced records of daily sales receipts as well as monthly totals. In *Du Page Liquor Store v. McKibben*, the court noted that there was "no evidence that the figures obtained are the total of a daily record of retail sales." (383 Ill. at 278, 48 N.E.2d at 927.) Although Mel-Park does not rely upon this language to suggest that its monthly summaries were sufficient records, we conclude that such summaries are not adequate, as

a matter of law, to overcome the Department's *prima facie* case. Our reasons follow.

In the case at bar, Mel-Park offered into evidence tapes that were monthly totals of daily receipts and costs, but did not produce the source documents from which these totals were made, and in fact had destroyed the source documents. Under the Illinois Administrative Code, the reference in *Du Page Liquor Store* notwithstanding, the taxpayer is required to maintain the records of the actual sales of the prescription drugs and merchandise. (86 Ill. Adm. Code §140.701 (1985).) Section 140.701(a) provides:

> "Every *** serviceman making sales or transactions which are subject to the [SOT] Act, shall keep all sales invoices, purchase orders, merchandise records and requisitions, inventory records, credit memos, debit memos, bills of lading, shipping records, and all other records pertaining to any and all purchases and sales of goods whether or not the *** serviceman believes them to be taxable under the Act; and the *** serviceman shall also keep summaries, recapitulations, totals, journal entries, ledger accounts, accounts receivable records, accounts payable records, statements, tax returns, and other documents listing, summarizing or pertaining to sales, purchases, inventory changes, shipments or other transactions."

Although the above-quoted paragraph clearly contemplates that summaries of sales be maintained, subsection (b) of section 140.701 further requires that "[s]uch books and records must clearly indicate and explain the complete information (deductions as well as cost price) which provide the basis for the information required for tax returns." (86 Ill. Adm. Code §140.701(b) (1985).) In addition, subsection (c) of section 140.701 provides that records of sufficient detail to show the cost price of an item must be kept:

> "Where the nature of a business is such that a portion of sales are nontaxable for any reason, then such records as will clearly indicate the information required in filing tax returns must be kept. Entries in any books, records or other pertinent papers or documents of the taxpayer in relation thereto shall be in detail sufficient to show the name and address of each purchaser to whom a sale is made, the character of every such transaction (*i.e.*, whether it is a sale for resale other than as an incident to a sale of service, a sale made within the protection of the Commerce Clause of the Constitution of the United States, etc.), the date of every such transaction and *the amount of cost price*

involved in every such transaction." (Emphasis added.) (86 Ill. Adm. Code §140.701(c) (1985).)

Thus, it is not sufficient for the taxpayer to maintain only summaries of the total costs of prescription drugs but also the character of every transaction must be established as to cost price. In addition, under the ROT, the Illinois Administrative Code (86 Ill. Adm. Code §130.310(d)(1) (1985)) requires that a retailer of medicine and medical supplies must keep an actual record of all sales:

"The retailer must keep an actual record of all sales and must report tax at the applicable rates, based on sales as reflected in his records. Books and records must be maintained in sufficient detail so that all receipts reported with respect to food, drugs, medicines and medical appliances can be supported."

Similarly, section 130.801(b) of the Administrative Code (86 Ill. Adm. Code §130.801(b) (1985)), requires retailers to "maintain complete books and records covering receipts from all sales and distinguishing taxable from nontaxable receipts." As previously noted, "[c]ash register tapes and other data which will provide a daily record of the gross amount of sales" are minimum requirements under the Administrative Code (86 Ill. Adm. Code §130.805(a) (1985)). Finally, under section 130.810(b) (86 Ill. Adm. Code §130.810(b) (1985)), entries in books and records used to support a claim of deduction must be in sufficient detail to show the character of the transaction, the amount of receipts realized and such other information as may be necessary to establish its nontaxable nature.

Under the foregoing requirements of the Administrative Code, it is clear that the ALJ correctly determined that Mel-Park had not carried its burden to overcome the *prima facie* case established by the corrected returns because it had failed to produce documentary evidence that met the minimum standards of recordkeeping required of retailers.

■■ We must return our attention to the matter of the prescription service fee deduction in order to address Mel-Park's argument that it was entitled to the deduction it claimed on its returns. Although the ALJ allowed Mel-Park to take the service prescription fee deduction, she did so to avoid the harsh result which would follow upon the auditor's disallowance of that deduction due to Mel-Park's failure to produce the actual records of its prescription costs. Finding that disallowing any prescription service fee deduction would be tantamount to imposing SOT tax liability on 100% of the receipts from prescription sales, and that the evidence showed there clearly was rendering of the service, the ALJ concluded that in the interest of

fairness Mel-Park could use the estimated 50% of gross sales method and thus take the prescription service fee deduction. But in doing so, the ALJ specifically affirmed the auditor's conclusion that Mel-Park was not eligible for the actual cost method of obtaining the deduction and that Mel-Park's returns amounted to an improper double deduction. The ALJ found that Lee Alport "had destroyed his daily prescription cost records after recording the totals" and that the auditor was not provided with the daily records or prescription costs or prescriptions. The auditor and her written summary did not show that Alport had offered her the tally sheets from which the prescription costs were totalled.

Under these circumstances, the ALJ ruled that Mel-Park was not entitled to the deduction as claimed on its returns, which was the double deduction figure. We hold that this was a correct ruling. The fact that the ALJ ameliorated the harshness of the result by awarding a single deduction that was supported by the evidence does not alter the correctness of the ruling that Mel-Park had not carried its burden of proof as to the deduction it had claimed.

Mel-Park argues that its exhibit, group exhibit No. 5, and its expert's testimony, together overcame the Department's *prima facie* case because the exhibit, invoices for the month of January 1984 from the General Drug Company, showed that prescription and nonprescription drugs could be distinguished; thus, it argues, the auditor could have based the SOT on the actual cost of prescription purchases rather than lumping all medicines and drugs together.

Mel-Park contends that group exhibit 5 contains three ways to identify prescription from nonprescription drugs: a narcotics blank, a symbol code, and a retail price column which is empty for any drug having a prescription code. Mel-Park complains that these invoices were available for the entire audit period and that the auditor could have based the SOT on the invoices rather than estimating that all drugs and medicines were about 22% of total sales.

In addition, Mel-Park argues that the expert's estimation of about 68.5% of total sales should have been for prescription drugs, based on the Lilly Digest, plus Lee Alport's testimony concerning the markup percentages he used, and should have proven a much lower tax liability than that assessed.

The ALJ disregarded the group exhibit 5 because she could not determine the criteria upon which the month of January 1984 was selected, and it was not a test month in the audit period. Therefore, she gave group exhibit 5 no weight. Further, the ALJ concluded that the auditor could not reasonably differentiate from the invoices which

drugs were prescription and which were not, and that even Bigane, Mel-Park's expert, needed Lee Alport to mark the invoices to make the distinction. The findings of the administrative law judge are *prima facie* correct and not to be set aside unless contrary to the manifest weight of the evidence. We conclude that the ALJ reviewed the exhibits and did not err in giving them no weight.

Regarding the expert testimony that the correct percentage of prescription drug sales should be closer to the Lilly Digest figure, we deem this evidence to be hearsay and not reliable. (*Puelo v. Department of Revenue*, 117 Ill. App. 3d 260, 453 N.E.2d 48; *Elkay Manufacturing Co. v. Sweet*, 202 Ill. App. 3d at 472, 559 N.E.2d at 1062.) There was nothing in the evidence to substantiate the basis for the estimate of the number of prescriptions filled daily, upon which the Lilly estimate was based.

While Mel-Park may have sketched out an alternative theory for estimating its gross receipts, it has not met its burden to overcome the *prima facie* case. (*Central Furniture Mart, Inc. v. Johnson*, 157 Ill. App. 3d at 911, 510 N.E.2d at 940.) We affirm the circuit court's decision as we are not prepared to say that Mel-Park has introduced evidence of sufficient strength to overcome the Department's *prima facie* case.

## II

■■ We must, finally, address Mel-Park's second claim, regarding the ALJ Bawolek's setting aside of the initial ALJ's recommended decision. We conclude that the circuit judge correctly ruled that ALJ Bawolek acted consistently with the circuit court's previous order of remand by making findings of fact and conclusions of law based on the evidence in the record. The remand order of May 27, 1988, stated:

> "This Court is cognizant that the absence of findings does not make the Administrative Decision void. However, the circumstances warrant written findings notwithstanding that the statute does not specifically require it."

The circuit court, on subsequent review, determined that the remand order had been complied with in that ALJ Bawolek had rendered explanations and reasoning for her final determination of tax liability.

Under the provisions for administrative review in the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 3—111(2)), the circuit court may "make any order it deems proper for the amendment, completion or filing of the record of the administrative agency." In addition, the circuit court has the power "[t]o reverse and remand the decision in whole or in part, and, in such case, to state the ques-

tions requiring further hearing or proceedings and to give such instructions as may be proper." (Ill. Rev. Stat. 1987, ch. 110, par. 3—111(6).) In the case at bar the circuit court noted that factual, not credibility, issues were to be resolved on remand and that the review by ALJ Bawolek reflected a complete and careful examination of the record.

Under section 11(c) of the Illinois Administrative Procedures Act (Act) (Ill. Rev. Stat. 1987, ch. 127, par. 1001 *et seq.*), findings of fact shall be based exclusively on the evidence and on matters officially noticed. (Ill. Rev. Stat. 1987, ch. 127, par. 1011(c).) In *Cook County Federal Savings & Loan Association v. Griffin* (1979), 73 Ill. App. 210, 391 N.E.2d 473, we stated that an administrative agency cannot base its decision on facts, data and testimony which do not appear in the record and that findings must be based on evidence introduced in the case and nothing can be treated as evidence which is not introduced as such. Under this standard, the ALJ was correct in rejecting the recommended decision of the prior ALJ since it was based on data not introduced into evidence. Similarly, in *Pedigo v. Department of Revenue* (105 Ill. App. 3d 759, 434 N.E.2d 860), we rejected evidence contained in a supplemental brief filed after the departmental hearing because such was never introduced at the hearing or in the circuit court on review. Thus, we affirm the decision of the circuit court to the extent that it ruled ALJ Bawolek's decision was issued consistently with the intent of the original remand order and the requirements of section 11(c) of the Illinois Administrative Procedures Act. Ill. Rev. Stat. 1987, ch. 127, par. 1011(c).

Plaintiff cites *Jones v. Board of Fire & Police Commissioners* (1984), 127 Ill. App. 3d 793, 797, 469 N.E.2d 393, 402, for the proposition that when a case is remanded with directions, the lower court can do nothing except carry out those directions. However, *Jones v. Board of Fire & Police Commissioners* states only that the lower court must proceed on remand as directed by the mandate and not the opinion, unless the mandate instructs the court to proceed in conformity with the opinion. We hold that the ALJ properly followed the directives on remand by the circuit court because setting aside the prior ALJ decision was proper and providing written findings of fact based on the hearing evidence complied with the essential requirement of the circuit court's remand order. Plaintiff's contention that it was improper for the ALJ to vacate the prior administrative decision also runs afoul of the general rule that when an administrative decision is reversed, vacated, or remanded, the case stands as if no decision had ever been made. (*Jones v. Board of Fire & Police Commis-*

*sioners*, 127 Ill. App. 3d at 801, 469 N.E.2d at 402; *Creamer v. Police Pension Fund Board* (1978), 69 Ill. App. 3d 792, 387 N.E.2d 711.) Finally, we conclude that there was no error in the second ALJ rendering a decision on the basis of the record made at the hearing before the previous ALJ. (*American Welding Supply Co. v. Department of Revenue* (1982), 106 Ill. App. 3d 93, 435 N.E.2d 761.) As we are persuaded that the ALJ fully considered the evidence, we find no error.

Accordingly, the judgment of the circuit court for the county of Cook is affirmed.

Judgment affirmed.

SCARIANO, P.J., and DiVITO, J., concur.