**2024 IL 129562**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 129562)

MARATHON PETROLEUM COMPANY LP, Appellant, v. THE COOK COUNTY DEPARTMENT OF REVENUE *et al*., Appellees.

*Opinion filed November 21, 2024.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, Cunningham, and Rochford concurred in the judgment and opinion.

## OPINION

¶ 1     Cook County imposes a sales tax on the retail sale of gasoline and diesel fuel. However, the collection of the tax is not done at the point of retail sale. Rather, the Cook County Retail Sale of Gasoline and Diesel Fuel Tax Ordinance (Fuel Tax Ordinance) sets forth that the obligation to collect the tax falls upon the distributors of the gasoline and diesel fuel products. See Cook County Code of Ordinances § 74-

472(c) (approved Feb. 16, 2011). The Cook County Department of Revenue (Department) is the agency responsible for administering and enforcing the Fuel Tax Ordinance. That responsibility includes auditing the records of fuel distributors in Cook County to be certain those distributors are remitting the appropriate amount of sales tax to Cook County. The dispute before us stems from an audit the Department performed on the records of plaintiff Marathon Petroleum Company LP (Marathon). Following the audit, the Department determined that Marathon failed to collect tax on certain transactions and assessed the tax against Marathon, as well as interest and penalties. Specifically, the question is whether Marathon has rebutted the presumption of the Department that the "book transfers" detailed in Marathon's internal summary reports (ISR) statements were taxable distributor-to-distributor sales that transferred ownership of gasoline from one distributor to another within Cook County, thereby triggering the obligation to collect the retail sales tax. Marathon sought administrative review, and the matter was referred to an administrative law judge (ALJ) with the Cook County Department of Administrative Hearings. The ALJ conducted a hearing and issued a decision upholding the assessments in their entirety.

¶ 2        Marathon sought judicial review, and the circuit court reversed and vacated the ALJ's decision. The Department appealed, and the appellate court reversed the judgment of the circuit court. The appellate court affirmed in part and reversed in part the ALJ's decision and remanded the matter for a recalculation of amount due. 2022 IL App (1st) 210635. Marathon filed a petition for leave to appeal to this court, which we allowed on September 27, 2023. As cross-relief, the Department seeks the reinstatement of the penalties as imposed by the ALJ.

¶ 3        We allowed several *amicus curiae* briefs in support of Marathon's position: American Fuel & Petrochemical Manufacturers and the American Petroleum Institute; the Illinois Fuel and Retail Association; the Council on State Taxation and the Taxpayers' Federation of Illinois; and the Illinois Chamber of Commerce. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 4                                    BACKGROUND

¶ 5        In May 2014, the Department began an audit of Marathon's gasoline and diesel transactions that occurred between January 2006 and July 2014. At the end of the

audit, the Department issued two "Notices of Tax Determination and Assessment" against Marathon for its failure to properly collect and remit the taxes pursuant to the Fuel Tax Ordinance on several million gallons of fuel. Marathon filed protests and petitions for hearing for both the gasoline and diesel fuel assessments, arguing that the auditor incorrectly included a number of transactions that were not taxable. After reviewing Marathon's protests and the additional documentation Marathon provided, the Department agreed with Marathon on all protested issues except the Department still concluded that entries that were noted as "book transfer," where the "ship from" and "ship to" fields stated Chicago, were taxable under the Fuel Tax Ordinance. The Department issued revised gasoline and diesel fuel assessments. According to the Department's audit work papers, the revised assessments were solely based upon "book transfer" transactions to unregistered distributors. The revised gasoline fuel assessment totaled $4,398,180.76 in tax, interest, and penalties, and the revised diesel fuel assessment totaled $10,537,077.16 in tax, interest, and penalties.

¶ 6        Marathon filed supplemental protests, continuing to protest the taxability of the "book transfer" transactions on the basis that the alleged sales to unregistered distributors were cash settlements of forward contracts that were financial transactions that did not result in a change of ownership or movement of fuel and thus were not taxable under the Fuel Tax Ordinance. Also, Marathon argued that the reference to Chicago in the "book transfer" transactions did not refer to terminals in Cook County but rather to a description of a region, not the city of Chicago.

¶ 7        The matter proceeded to an evidentiary hearing. The evidence established that Marathon is a refiner of crude oil, and it distributes petroleum products from facilities in Illinois. Marathon maintains fuel inventories at several terminal and refinery locations throughout the state of Illinois. Because it sells fuel to retailers and other distributors in Cook County, Marathon held a fuel distributor registration certificate issued by the Department during the entire audit period. Marathon distributed fuel from three locations in Cook County: Mount Prospect, Argo, and Des Plaines. None of those locations are within the limits of the city of Chicago.

¶ 8        The Department presented two witnesses who testified regarding the audit of Marathon.[1] Jose Vega, an audit supervisor with the Department, identified an ISR as a summary of transactions provided by Marathon during the audit. The ISR was part of a longer Excel schedule provided by Marathon in response to a request for reports that were created and used to complete Marathon's fuel tax returns. The ISR had a number of columns that identified the name of the filer, the name of the seller/purchaser, invoice date, invoice number, ticket date, ticket number, net gallons, type of product, origin, destination, and carrier. On the ISR, Marathon was the filer, and the seller/purchaser column showed the purchaser. The type of product was either denoted as gasoline, or the field was blank. If blank, the product was diesel fuel.

¶ 9        Vega testified that he believed that the destination field on the ISR was a critical entry, because the transaction was taxable if it occurred in Cook County. For example, Vega identified a transaction on the first page of the ISR, where the origin and destination were both Mount Prospect. Because Mount Prospect was in Cook County, the transaction would be taxable to Marathon if the purchaser was an unregistered distributor. The same was true for the transactions that identified Argo as the origin or destination, as Argo was also in Cook County. According to Vega, the entries that listed Chicago on the ISR as the origin and destination were also deemed to be taxable because Chicago is in Cook County, even though Vega knew that Marathon did not have any terminals or refineries in Chicago.

¶ 10       Vega testified that the contracts and invoices that supported the entries on the ISR indicated that cash payments were made for each sale. In conducting the audit of Marathon, if the purchaser was not on the list of registered distributors and the destination was in Cook County, then the Department deemed the transaction to be taxable as a distributor-to-distributor transaction under the Fuel Tax Ordinance.

¶ 11       Gary Michals, the deputy director of compliance for the Department, identified the ISR as the monthly summary sales report provided by Marathon to the Department for purposes of the audit. The Department evaluated the information in the ISR to determine whether any of the transactions were potentially taxable under the ordinance—*i.e.*, whether the destination was within Cook County and, if so,

---

[1]Pamela Davis, the auditor who performed the audit on Marathon, was no longer employed with the Department at the time of the hearing.

whether the distributor was unregistered in Cook County. The Department's computation of taxes due, from transactions with eight unregistered distributors, was derived from the ISR. All of the transactions identified were labeled as "book transfer" in the carrier name field and a destination of "Chicago" on the ISR. Michals testified that, under the ordinance, "sale" meant any transfer of ownership or possession. For the Department's evaluation, Marathon's description that a transaction was a "book transfer" was not controlling.

¶ 12     According to Michals, Marathon was asked to provide a sampling of contracts and invoices to determine the delivery point for the transactions where the destination was Chicago. Michals testified that the supporting contracts and invoices indicated that the delivery was to be to a generic Chicago pipeline or FOB[2] Chicago. Because delivery was to Chicago and Chicago was in Cook County, it was a taxable transaction. A distributor, as defined by the fuel ordinance, included those entities that received fuel in Cook County. According to the information supplied by Marathon, the unregistered distributors received fuel in Cook County when there was a transfer of ownership of the fuel.

¶ 13     Marathon presented two witnesses who testified regarding Marathon's records and business practices. Joseph Steiner, a motor fuel tax specialist employed by Marathon, testified regarding the "book transfer" entries on the ISR. A book out transaction is a mechanism to financially settle contracts without physically moving or transferring any product. Marathon's accounting department also refers to such transactions as a book transfer, and the transactions identified as "book transfers" on the ISR were book out transactions. The accounting department entered "book transfer" in the carrier field of the ISR because the accounting software would not allow the carrier field to remain blank. For the same reason, the accounting department would enter "Chicago" in the origin and destination fields, even though "Chicago" was merely a reference to the generic Chicago pricing area.

¶ 14     Steiner distinguished book out transactions from transactions where there was evidence of the physical delivery of fuel. When fuel is physically moved, some documentation that denotes the physical transaction is created. If fuel is moved on

---

[2]"FOB" is an abbreviation for "free on board" or "freight on board," in which the seller pays the freight charges and bears the risk of loss until the goods pass to the transporter's possession. Black's Law Dictionary (12th ed. 2024).

a pipeline or into a terminal off a pipeline, a meter ticket is generated. The meter ticket indicates where the transaction is going to take place, noting the amount, quantity, and quality of the fuel. A transfer of inventory within a terminal is evidenced by a transfer order, which tells the terminal that one company's inventory position is decreasing and the other company's inventory is increasing. A bill of lading can also evidence a physical transfer of fuel via a shipping truck.

¶ 15        Steiner identified an entry on the ISR that indicated a physical transfer of fuel. The ISR stated a specific origin and destination, "Argo," which indicated that the product came from Marathon's inventory position at the Argo, Illinois, terminal. The "carrier name" field contained the name of a trucking company, indicating the physical transfer of product by truck. That was confirmed by the volume of fuel; less than 8000 gallons of fuel could be moved by truck.

¶ 16        Steiner described how he could identify a book out on the ISR. First, the carrier name was "book transfer," and the volume was too great to be transported by truck. For example, a transaction involving 420,000 gallons would require about 50 trucks. Second, the origin and destination stated "Chicago" rather than a specific location where Marathon maintained an inventory of fuel.

¶ 17        Matthew Freeman, a commercial analyst manager for Marathon Petroleum Logistics Services, a subsidiary of Marathon, testified that there are three refineries in the Chicago region. All three refineries were located outside of Chicago and outside of Cook County. Marathon does not own any fuel inside the three Chicago area refineries; in other words, Marathon does not hold any inventory positions at those refineries. Freeman testified that an inventory position means title to or possession of a product.

¶ 18        A terminal is the location where fuel is stored until it is sold to another party, at which time it can be transported by truck, acquired by a party who has the ability to hold an inventory position at that terminal, or moved via a pipeline. There is one terminal located in the city of Chicago, Kinder Morgan, on Stony Island Avenue. However, Marathon does not own any inventory inside the Kinder Morgan terminal because it does not have a throughput agreement that would allow it to have an inventory position there.

¶ 19 Freeman described Marathon's forward contract process. First, Marathon and another party negotiate a deal, which is memorialized on a physical deal sheet. The deal sheet is then sent to the contract administrator, who enters the deal in the deal capture system, resulting in an electronic form that can be forwarded to other departments and the other contracting party. That form results in a sales agreement, or a matching buy/sell agreement. The form is also sent out to the intercontinental exchange, which is a generally accepted industry platform. The forward contracts can be fulfilled by physical delivery of fuel or, in lieu of physical delivery, by a book out. Freeman reiterated Steiner's testimony that, to physically transfer product at a terminal, there would either be a meter ticket or transfer order.

¶ 20 Freeman explained that contracts cannot be canceled in the fuel industry, so book outs are used to financially settle contracts where one or both parties does not or cannot transfer the physical product. In a book out, no meter ticket or transfer order is generated because there is no physical movement of product; it is just a financial transaction. There is no change of ownership or title. Freeman described three different types of book outs used by Marathon: direct, indirect, and distress. A direct book out is between two companies, basically bringing two deals together and financially settling them. There is no need to move product, and neither party's inventory changes. These types of book outs are done for logistics savings. An indirect book out is similar, except it involves a chain of parties. The third type of book out is a distress book out, where party *A* cannot deliver the contracted product to party *B*. The parties enter into a second agreement, where party *B* agrees to sell the same amount of fuel to party *A*, and the two agreements are financially settled.

¶ 21 Freeman explained a matching buy-sell sales agreement in the record, between Marathon and Sunoco in February 2009, and how the transaction was booked out by Marathon. That sales agreement included a buy side contract where Marathon purchased 20,000 barrels of 87 regular conventional fuel from Sunoco and a sell side contract where Marathon was selling 20,000 barrels of 87 regular conventional fuel to Sunoco. Each side of the contract had a different identification number. According to the contract, delivery was to be into a generic Chicago pipeline. Marathon was the buyer of the product in the first February pipeline cycle and the seller of the product in the second February pipeline cycle. Marathon took physical delivery of the product as the buyer, but when it came time to do the sell side of the contract, schedulers discovered that there was an independent contract with Sunoco

for the same quantity in the Chicago pricing region.[3] Thus, a book transfer letter was generated, which settled those two obligations by a financial book out rather than by physical delivery. The book transfer letter assigned a book transfer number for the transaction. Freeman then identified a copy of the book transfer invoice, which referenced the book transfer number and the invoice number, which was the invoice that Marathon sent to Sunoco on the sell side of the original buy-sell contract. During his testimony, Steiner identified that invoice number on the ISR and explained how the invoice numbers were reflected in the relevant column on the ISR.

¶ 22        Freeman pointed out that, since there was no physical movement of fuel, there was no meter ticket or terminal transfer order to reference on the invoice. Freeman testified that this book out was representative of the documentation that Marathon uses to document all its book outs: a deal sheet, matching buy/sell or individual buy or sell contracts, book transfer letters, and invoices. Freeman was unequivocal that Marathon's inventory levels do not change and title to the fuel never transfers from Marathon to any other party in a book out.

¶ 23        Freeman testified that, even though the contract stated the delivery would be into a generic Chicago pipeline, FOB Chicago, Illinois, Marathon could not have transferred this fuel in the city of Chicago. Marathon did not have a throughput agreement with the only terminal in the city of Chicago, so it did not have title to any fuel in that terminal. Rather, generic Chicago pipeline and FOB Chicago indicated a pricing region, not the physical delivery of product in Chicago.

¶ 24        Marathon called Dr. Greg Arburn to testify as an expert witness. Dr. Arburn, a professor of finance and economics at the University of Findlay, testified that a book out transaction is essentially the settlement of a forward contract, which is an agreement to deliver or accept delivery of a product at a future point in time. Parties use forward contracts to control costs and manage risks. Forward contracts are not regulated by the Commodities Futures Trading Commission, although futures contracts and options contracts on the futures are so regulated. Dr. Arburn described the book out used by Marathon as a method to financially settle one or more forward

[3]Marathon admits that it did not submit into evidence the separate buy contract from Sunoco. Marathon argues that it was not relevant, because Marathon was the purchaser, which is not a taxable transaction to Marathon. Also, Marathon would not issue an invoice as the purchaser.

contracts, in lieu of actual delivery of product. Dr. Arburn testified that, in a book out transaction, there is no change in possession of the commodity. Rather, a party may acquire or sell an intangible interest in that commodity.

¶ 25    The Department presented one expert witness in rebuttal, Dr. Andria Van Der Merwe, an economic consultant, whose testimony was largely consistent with Dr. Arburn's testimony. Dr. Van Der Merwe described a forward contract as a nonstandard, privately negotiated, bilateral contract. It creates an economic obligation to buy or sell at a future date. A party to the forward contract may physically deliver the commodity, or it may deliver cash instead. Dr. Van Der Merwe testified that, in a financial settlement of a forward contract, there is no physical transfer of possession of the commodity. When asked by the ALJ whether there was a change in ownership or transfer of title or ownership in those cash settlement transactions, Dr. Van Der Merwe stated: "From an economic perspective, I don't want to opine on transfer of title."

¶ 26    The ALJ upheld both assessments on the ground that Marathon failed to satisfy its burden to rebut the Department's *prima facie* case of tax liability. The ALJ found that it was Marathon's burden to establish the exact nature of what Marathon termed a book out or book transfer transaction and that Marathon failed to introduce sufficient documentary evidence to corroborate its claim that ownership did not transfer during those transactions. That evidentiary failure was established by the testimony of Freeman. Particularly, according to the ALJ, Freeman identified different types of book outs but failed to quantify each of the identified types of book outs on the ISR. The ALJ found that Marathon also failed to present an underlying contract in the book out transaction described by Freeman in his testimony. In addition, Marathon failed to introduce any document showing the parties' agreement as to the price term in the two cash settlements identified by Freeman. According to the ALJ, Marathon did not produce documentary evidence memorializing the parties' agreement to settle two forward contracts for cash, and that evidentiary failure made it

> "impossible to address the central claim Marathon advances in this litigation which is that settling forward contracts involving gasoline and diesel fuel for cash is not subject to the [Fuel] Tax Ordinance because cash settlements, by

their terms, never result in a sale between the settling parties, let alone the retail sale of taxable fuel in Cook County."

Thus, the ALJ rejected Marathon's principal contention that the cash settlement of forward contracts was not subject to the Fuel Tax Ordinance. The ALJ upheld the imposition of penalties for Marathon's failure to collect and remit the fuel taxes.

¶ 27 Marathon filed a petition for review of the ALJ's decision in the circuit court, pursuant to section 3-104 of the Administrative Review Law. See 735 ILCS 5/3-102, 3-104 (West 2018). The circuit court reversed the ALJ's decision, finding that the ALJ's ruling was clearly erroneous and against the manifest weight of the evidence. The circuit court found that the ALJ ignored Marathon's unrebutted testimony regarding the fact that "book transfers" on Marathon's ISR were financial transactions and that the meaning of "Chicago" for origin and destination on those entries indicated a pricing region. The circuit court found that the Department failed to establish its *prima facie* case because the corrected assessments did not meet a minimum standard of reasonableness. But, even if it was assumed that the Department had established a *prima facie* case, Marathon submitted sufficient evidence to shift the burden back to the Department to prove that the transactions were subject to the tax. The ALJ erred in concluding that Marathon failed to prove there was no transfer of possession or title in the transactions that Marathon identified as book out transactions.

¶ 28 The appellate court reversed the circuit court's decision and affirmed in part the ALJ's decision. The appellate court determined that the record showed that the Department's auditing method met a minimum standard of reasonableness and that the Department established a *prima facie* case. The Department auditors reviewed Marathon's ISR, along with additional contracts, invoices, and documents provided by Marathon, and identified multiple sales transactions between Marathon and distributors unregistered with the Department. The transactions were determined to be sales because the ISR listed Marathon as the seller, a purchaser company that was not listed as a registered Cook County distributor, a quantity of fuel sold, and the origin and destination of that fuel was in Chicago, which is in Cook County. 2022 IL App (1st) 210635, ¶ 30. The appellate court agreed with the ALJ that Marathon did not meet its burden of rebutting the Department's *prima facie* case that the book out transactions were taxable sales under the Fuel Tax Ordinance. *Id.*

- 10 -

¶ 35. The appellate court concluded that there was no question that the book out transactions occurred and that the ALJ's conclusion that Marathon failed to corroborate testimony regarding the nature of book outs with documentary evidence was misplaced. *Id.* Rather, the appellate court concluded that the transfer of an intangible ownership interest was enough to make the book out transactions taxable under section 74-471 of the Fuel Tax Ordinance. *Id.* ¶ 37.

¶ 29    As for the imposed penalties, the appellate court found that Marathon showed reasonable cause for its failure to pay the taxes at the time of the sales, so it reversed the ALJ's imposition of penalties and remanded for a recalculation of the amount due. We granted Marathon's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 30                                 ANALYSIS

¶ 31    Marathon contends that the book out transactions at issue were not taxable sales of motor fuel under the Fuel Tax Ordinance. It contends that the transfer of an intangible right is not taxable under the Fuel Tax Ordinance. The Department argues that we do not need to reach that issue. Rather, the Department contends that the ALJ's conclusion that Marathon failed to rebut the *prima facie* case of taxability was not clearly erroneous.

¶ 32    To frame our analysis, we must first determine the appropriate degree of deference to be afforded the ALJ's opinion, which directs our appropriate standard of review. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007) ("In administrative cases, we review the decision of the administrative agency, not the determination of the circuit court."). When reviewing a decision of an administrative agency, courts may encounter questions of fact, questions of law, and questions of facts applied to the law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). The standard of review varies depending on the type of question. *Id.* An administrative agency's findings and conclusions on questions of fact "shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2022). Thus, a reviewing court will only reverse an administrative agency's factual findings if they are against the manifest weight of the evidence, *i.e.*, the opposite conclusion is clearly evident. *Cinkus*, 228 Ill. 2d at 210. The agency's interpretation of the meaning of the

language of a statute, on the other hand, is a question of law that is not entitled to deference, so the agency's interpretation is reviewed *de novo*. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005).

¶ 33    An agency's decision on the legal effect of a given set of facts is a mixed question of law and fact and is reviewed under the clearly erroneous standard. *Id.* The clearly erroneous standard of review requires the reviewing court to apply a level of deference that falls between the manifest weight of the evidence and *de novo* standards, thereby allowing for some deference to the agency's expertise. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Applying a clearly erroneous standard "does not mean, however, that a reviewing court must blindly defer to the agency's decision." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 34    Marathon argues that we should apply *de novo* review to the overarching question of whether the Fuel Tax Ordinance applies to book out transactions. With regard to the question of whether Marathon rebutted the Department's *prima facie* case of taxability, Marathon contends this is a mixed question of law and fact that is subject to the clearly erroneous standard of review. The Department agrees that we should apply the clearly erroneous standard of review to the ALJ's conclusion that Marathon was liable for the full amount of the revised assessments.

¶ 35    The issue here revolves around the ALJ's findings regarding Marathon's evidence and whether the ALJ properly found that Marathon presented insufficient evidence to rebut the Department's *prima facie* case of taxability. Thus, we begin by addressing the Department's *prima facie* case and the ALJ's conclusion that Marathon failed to rebut the Department's *prima facie* case due to some evidentiary shortcomings. Under the standards as stated above, factual findings will be reviewed under the manifest weight of the evidence standard, while the ALJ's ultimate conclusion will only be reversed if clearly erroneous.

¶ 36    Section 74-472 of the Fuel Tax Ordinance imposes a tax "on the retail sale in Cook County of gasoline, diesel fuel, biodiesel fuel, and gdiesel fuel at the rate of $0.06 per gallon or fraction thereof. The tax is to be paid by the purchaser ***." Cook County Code of Ordinances § 74-472(a) (approved Feb. 16, 2011). The tax

"shall be collected by each Distributor or supplier who sells gasoline, diesel fuel, biodiesel fuel, and gdiesel fuel to:

> (1) A Retail dealer doing business in the County;

> (2) A consumer who purchases gasoline, diesel fuel, biodiesel fuel or gdiesel fuel directly from a Gas Distributor for delivery in the County; or

> (3) Another Gas Distributor doing business in the County that is not holding a valid registration certificate." *Id.* § 74-472(c)(1)-(3).

¶ 37     "Sale" is defined under the Fuel Tax Ordinance as "any transfer of ownership or possession or both, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever. In every case where gasoline, diesel fuel, biodiesel, or gdiesel fuel are exchanged, given or otherwise disposed of, it shall be deemed to have been sold." *Id.* § 74-471.

¶ 38     While the fuel tax is imposed on the consumer, the ordinance establishes a collect-and-remit architecture whereby the last distributor in a distribution chain generally is responsible for paying the tax. See *id.* § 74-472(c). However, in distributor-to-distributor sales, the selling distributor only collects the fuel tax and remits it to the Department if the buying distributor is doing business in Cook County but is not registered with the Department. *Id.* §§ 74-472(c)(3), 74-473(1). As the ALJ pointed out in her opinion, the ordinance is "constructed on the rebuttable presumption that distributor-to-distributor transactions involving taxable fuel that take place in Cook County will lead ultimately to the retail sale of taxable fuel in Cook County." *County of Cook v. Marathon Petroleum Co.*, Cook County Dep't of Admin. Hearings Op. No. RG-160012, at 3 n.4 (2019)

¶ 39     The plain language of the Fuel Tax Ordinance is to tax only transactions involving the sale of motor fuel, specifically to tax only retail sales of motor fuel. See *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 37-38 (2009) ("The legislative intent of a statute is best determined from the plain and ordinary meaning of the language used in the statute."). The question presented by this case is whether monetary settlements of contracts for the sale of motor fuel (that do not involve the movement of fuel or connection to a retail sale) fall within the definition of "sale" as set forth in the Fuel Tax Ordinance.

¶ 40    In this circumstance, when a taxpayer challenges the imposition of a tax, the initial burden is on the Department to establish a *prima facie* case of taxability. *Illinois Cereal Mills, Inc. v. Department of Revenue*, 99 Ill. 2d 9, 15 (1983). If the Department establishes its *prima facie* case, the burden shifts to the taxpayer to overcome the *prima facie* presumption by showing the transaction to be nontaxable. *Id.* at 15-16. When the *prima facie* presumption is overcome, the burden shifts back to the Department to prove its case by a preponderance of competent evidence. *Goldfarb v. Department of Revenue*, 411 Ill. 573, 580 (1952).

¶ 41                    I. The Department's *Prima Facie* Case

¶ 42    Marathon contends that the Department failed to establish a *prima facie* case that the book out transactions were taxable under the Fuel Tax Ordinance, which was the conclusion of the circuit court. Marathon argues that the Department ignored Marathon's records and substituted the Department's own belief regarding the interpretation of Marathon's records, which was contrary to the evidence of record. The ALJ did not specifically state that the Department established a *prima facie* case but proceeded directly to the question of whether Marathon rebutted the Department's *prima facie* case. Thus, Marathon contends that the ALJ's failure to rule in its favor on this issue was clearly erroneous.

¶ 43    The Department contends that Marathon has forfeited this argument because Marathon never argued in the administrative proceedings that the Department's assessments did not establish a *prima facie* case of taxability on the basis that the assessments were created using unreasonable methods or assumptions. Marathon did not raise the issue until proceedings in the circuit court. In any event, the Department contends that the revised assessments made out a *prima facie* case of taxability.

¶ 44    Issues not raised before the administrative agency are forfeited. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 205 (2008). In this case, the ALJ proceeded directly to determining whether Marathon met its burden of rebutting the *prima facie* case because the parties never addressed any challenge to the Department's *prima facie* case. Marathon did not argue that the Department's assessments were not *prima facie* correct or were created using

- 14 -

unreasonable methods of assumptions. In fact, at closing arguments in the administrative proceedings, Marathon's attorney stated: "There's absolutely no doubt that tax assessments are *prima facie* correct, and the burden rests with us, Marathon, to overcome the *prima facie* correctness of that assessment." Thus, Marathon has forfeited the argument that the Department failed to establish a *prima facie* case that the book out transactions were taxable under the Fuel Tax Ordinance.

¶ 45     Even if not forfeited, we find that the ALJ's implicit conclusion that the Department established its *prima facie* case was not clearly erroneous. Section 34-64 of the Cook County Code of Ordinances specifically states that "[a]ny tax determination and assessment, or amended tax determination and assessment, shall be deemed prima facie correct and the burden shall be on the person assessed to prove the contrary." Cook County Code of Ordinances § 34-64(b)(2) (approved Feb. 16, 2011). Thus, the Department's revised assessments are "deemed *prima facie* correct and [are] *prima facie* evidence of the correctness of the amount of tax due." See *Illinois Cereal Mills, Inc.*, 99 Ill. 2d at 15 (analyzing similar language in section 4 of Retailers' Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 120, ¶ 443)).

¶ 46     The Department based the revised assessments on the information contained in the ISR, which was a list of fuel transactions invoiced by Marathon. The data in the ISR was confirmed by the Department with a review of the underlying contracts and invoices. Each entry on the ISR listed a purchaser, an invoice number, a fuel amount, and a destination. Related documents provided to the Department were contracts, titled "matching buy/sell," that referenced a "purchase and sale transaction." Invoices were generated for each transaction. Based on those indicia of sales, the Department concluded that each transaction was a sale of motor fuel. The Department then turned to its own records to ascertain whether the identified purchasers were registered with the Department as distributors. The Department identified numerous transactions where the destination was listed as "Chicago," the carrier name was "book transfer," and the purchaser was a distributor not registered in Cook County. The auditor concluded that those transactions were taxable under the Fuel Tax Ordinance.

¶ 47    Marathon's ISR, the auditor's reliance on the ISR and its underlying documentation, and the auditor's testimony established the Department's *prima facie* case of tax liability against Marathon.

¶ 48                           II. Marathon's Case in Rebuttal

¶ 49    Because the Department established a *prima facie* case that the challenged "book transfer" transactions were taxable under the Fuel Tax Ordinance, the burden shifted to Marathon to overcome the *prima facie* case by showing by competent evidence that the revised assessments were not transactions subject to the Fuel Tax Ordinance. See *Fillichio v. Department of Revenue*, 15 Ill. 2d 327, 333 (1958). Marathon contends that it met its burden and successfully rebutted the Department's *prima facie* case of taxability regarding the transactions labeled "book transfer" on the ISR. The Department contends that Marathon did not present competent evidence to rebut the *prima facie* case. Rather, the Department argues that Marathon presented testimony, rather than documentary evidence, to support its rebuttal. In addition, the Department contends that Marathon failed to come forward with books and records that showed that any book outs took place. Specifically, the Department contends that Marathon failed to show the contracts that set forth the terms of the book outs.

¶ 50    "To overcome the Department's *prima facie* case, a taxpayer must present more than its testimony denying the accuracy of the assessments, but must present sufficient documentary support for its assertions." *Mel-Park Drugs, Inc. v. Department of Revenue*, 218 Ill. App. 3d 203, 217 (1991). Under the Cook County Code of Ordinances, a taxpayer "shall keep accurate books and records of its beginning inventory, purchases, sales and ending inventory including original source documents and books of entry denoting the transactions that gave rise, or may have given rise, to any tax liability, exemption or deduction or defense to liability." Cook County Code of Ordinances § 74-477 (approved Feb. 16, 2011). "At any hearing held under this article, the tax determination and assessment shall be prima facie correct and the protesting party shall have the burden of proving with books, records and other documentary evidence that [it] is incorrect." *Id.* § 34-81(g)(1).

¶ 51    The ALJ concluded that Marathon failed to present sufficient documentary evidence to rebut the presumption of taxability under the Fuel Tax Ordinance. Specifically, the ALJ concluded that Marathon failed to introduce sufficient documentary evidence to corroborate Marathon's claim that a book out of a forward contract involves nothing more than a cash payment, transferring neither possession nor ownership of fuel. In reaching that decision, the ALJ found that Marathon's evidence failed in two respects and that those failings were fatal to Marathon's burden in rebuttal. First, Marathon presented evidence identifying different types of book outs but failed to quantify how many of each book out were referenced on the ISR and only produced supporting documents to describe one type of book out. Second, Marathon failed to present a separate writing that documented the cash settlement of two forward contracts. For the reasons that follow, we find that the ALJ misunderstood some of the evidence presented by Marathon and its relevance to Marathon's rebuttal of the Department's *prima facie* case, resulting in a conclusion that was clearly erroneous.

¶ 52    The ALJ was correct that Marathon's evidence did not quantify each type of book out. The ALJ does not explain, though, how the type of book out was relevant to the information on the ISR. In addition, Marathon presented evidence that all of its book out transactions resulted in the same documentation, and there was no evidence that indicated that the underlying reason for the book out had any effect on the book out process. Also, Marathon did quantify how many of the subject transactions that were assessed the Motor Fuel Tax in the revised assessments were identified as book outs—all of the disputed transactions. The Department states as much in its posthearing brief:

    "The only issue before this Court is whether the tax assessed by the Department was applicable to the relevant transactions. The relevant transactions are listed as 'Book Transfer' on the Internal Summary Report in the final column, identified at the top as 'Carrier.' "

¶ 53    To the extent that the Department denied that book outs identified in the revised assessments represented all of the transactions in dispute, that denial was made prior to the administrative hearing. After the hearing, it was not disputed that every one of the relevant transactions subject to the revised assessments were transactions that were identified as "book transfer" on the ISR. Thus, while the ALJ was correct

that Marathon failed to establish how many of each book out were a particular type of book out, the evidence does not support the ALJ's conclusion that quantifying the type of book out was relevant to the analysis. Also, to the extent that the ALJ determined that Marathon did not establish that every disputed transaction was identified as a book out transaction, that was a misunderstanding of the evidence.

¶ 54    The second evidentiary failure identified by the ALJ was that Marathon "did not present the separate forward contract under which Sunoco was to sell to Marathon" identified by Freeman in his book out example. The ALJ concluded that this missing separate forward contract was *the* document that memorialized the parties' agreement to settle the two forward contracts for cash and set forth the terms of the settlement. The ALJ found that the book transfer letter contained that information, but the ALJ rejected the book transfer letter as insufficient because it was an internal document that could not "substitute for documents establishing the parties' meeting of the minds that the two forward contracts would be settled for cash." *Marathon*, Cook County Dep't of Admin. Hearings Op. No. RG-160012, at 16 n.10.

¶ 55    Those conclusions misunderstand the testimony presented by Marathon. Freeman referred to a "second" or "separate" contract in his explanation of book outs. However, the second or separate contract that Freeman referred to was another forward contract that matched the initial forward contract in terms of parties and product so that the schedulers for Marathon would identify the transaction as one that could be booked out. In Freeman's example, there was a matching buy/sell contract between Marathon and Sunoco where Marathon was the buyer of the product in the first February pipeline cycle and the seller of the product in the second February pipeline cycle. Marathon took physical delivery of the product as the buyer, but the sell side of the contract was booked out with another contract between Marathon and Sunoco. Freeman's testimony established that the book out letter referenced both of those contracts. Sunoco was then invoiced, with a book transfer invoice, and Freeman identified the references in the invoice to the book transfer number, the sales identification number, and the purchase identification number. According to the testimony of Freeman and Steiner, the terms of the book out were determined by the price terms in the two separate, underlying contracts. Steiner's testimony tied the invoice issued to Sunoco with the information in the ISR.

¶ 56        Marathon admits that it did not submit into evidence the separate buy contract from Sunoco. So, the ALJ was correct that the "separate" contract referenced was not in evidence. However, that does not support the ALJ's conclusion that Marathon's failure to produce that underlying contract was a failure to introduce the document that shows the parties' agreement to settle forward contracts for cash and agreement as to the price term.

¶ 57        The record plainly discloses that Marathon relied upon a comprehensive business record, the ISR, that recorded the book out transactions with specificity. Marathon presented additional documentary evidence in the form of exemplar contracts, book letters, and invoices, which were contained in the records that had been made available to the Department during the audit. In fact, Marathon relied upon the same documentary evidence that was relied upon by the Department: the ISR and the underlying contracts and invoices. Compilation documents, which aggregate and assimilate information from numerous other documents, are admissible. See *People ex rel. Wenzel v. Chicago & North Western Ry. Co.*, 28 Ill. 2d 205, 213 (1963) (where a fact may be ascertained only by the inspection of a large number of documents, a documentary summary of the net result, supported by testimony, is admissible). Marathon introduced documents, admitted into evidence, to show how the book transfer process occurred and how it was documented in a fashion that was reflected on the ISR. Marathon established that its book outs, no matter the type, were documented the same way: a deal sheet, offsetting contracts, a book transfer letter, and invoices. Each party invoiced on its own underlying sales contract, and the price and terms were dictated by those contracts. The exemplar invoices, which were included with the documentation that was available to the Department during the audit, reflected the lack of the elements necessary to show the physical movement of fuel: specifically, there were no references to meter tickets or a transfer order. Marathon's witnesses testified as to how these transactions involved no change in possession or ownership of fuel but merely reflected a cash settlement of forward contracts, which rendered the transactions merely financial. "[A] finder of fact may not simply reject unrebutted testimony." *Sweilem v. Department of Revenue*, 372 Ill. App. 3d 475, 485 (2007).

¶ 58        In sum, Marathon relied on regular business documents and explained and linked those documents with testimony, which, taken as a whole, were sufficient to rebut the Department's *prima facie* case. See *Miller v. Department of Revenue*, 408

Ill. 574, 582 (1951) (holding that the testimonial and documentary evidence presented by the taxpayer was sufficient to overcome the *prima facie* case). Marathon did not seek to rebut the Department's *prima facie* case solely with testimony. But see *Du Page Liquor Store v. McKibbin*, 383 Ill. 276, 279 (1943) (testimony that tax returns were incorrect, in addition to nondescript pages that were not identified or connected to a record kept by the taxpayer, were not sufficient to overcome the *prima facie* case).

¶ 59     The ALJ's conclusion that Marathon failed to corroborate Freeman's testimony by failing to produce documentary evidence of other contracts associated with the cash settlement of forward contracts and documentary evidence memorializing the cash settlements themselves was based upon misunderstandings of the evidence. Because the ALJ's ultimate conclusion that Marathon failed to present sufficient documentary evidence to corroborate its claim that cash settlements were financial exercises and did not transfer any ownership was based upon those factual findings, we find that conclusion to be clearly erroneous in view of the entire record. See *American Federation of State, County & Municipal Employees, Council 31*, 216 Ill. 2d at 577-78 ("A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed.").

¶ 60     We find the competent evidence presented by Marathon regarding the book out transactions between Marathon and other distributors was sufficient to rebut the Fuel Tax Ordinance's presumption that the transactions would ultimately lead to the retail sale of taxable fuel in Cook County. Because Marathon sufficiently rebutted the Department's *prima facie* presumption of taxability, the burden shifted back to the Department to prove its case by a preponderance of competent evidence. See *Goldfarb*, 411 Ill. at 580. The ALJ, though, stopped her analysis after determining that Marathon did not rebut the Department's *prima facie* case, so she did not reach this point in the analysis. "[A] decision by an administrative agency must contain findings to make possible a judicial review of the agency's decision." *Reinhardt v. Board of Education of Alton Community Unit School District No. 11*, 61 Ill. 2d 101, 103 (1975). Thus, we reverse the judgment of the appellate court. We also affirm in part and reverse in part the judgment of the circuit court. We affirm the part of the circuit court's judgment reversing the ALJ's decision in favor of the Department and reverse the remainder of the circuit court's judgment. The matter is remanded to the Cook County Department of Administrative Hearings

with directions to make appropriate findings of fact and reach the determination of whether the Department has proven its case of taxability under the Fuel Tax Ordinance.[4] See *Crabtree v. Illinois Department of Agriculture*, 128 Ill. 2d 510, 524 (1989) (where criteria applied by administrative agency was incomplete, remand for determination by the administrative agency was appropriate). In light of this holding, we do not need to address the other arguments raised by the parties in their briefs.

¶ 61                                    CONCLUSION

¶ 62      For the foregoing reasons, the judgment of the appellate court is reversed. The judgment of the circuit court is affirmed in part and reversed in part, in accordance with this opinion. The decision of the ALJ, which upheld the revised assessments, is reversed, and the matter is remanded to the Cook County Department of Administrative Hearings for further proceedings in accordance with this opinion.

¶ 63      Appellate court judgment reversed.

¶ 64      Circuit court judgment affirmed in part and reversed in part.

¶ 65      Administrative decision reversed.

¶ 66      Cause remanded.

---

[4]We are specifically finding that the ALJ's determination, based upon the evidence submitted at the evidentiary hearing, was incomplete and are remanding solely for a completion of that process. There is no basis for the ALJ to begin the hearing process anew or to accept additional evidence.